[No. 1581-2.   Division Two.   May 26, 1976.]

PAUL W. JENSEN, ET AL, *Respondents*, v. J. L. LEDGETT, ET AL, *Appellants*.

*John A. Barlow* (of *Walstead, Mertsching, Husemoen, Donaldson & Barlow*), for appellants.

*John R. Fox,* for respondents.

PETRIE, C.J.—J. L. Ledgett and his wife, LaVerne Ledgett, appeal from a judgment (1) granting rescission, due to mutual mistake, of their contract to sell certain real property to Paul W. Jensen and Lena Jensen, and (2) returning to the Jensens the sum of $8,000 cash and a $2,000 promissory note, both given as a down payment on the purchase.

The basis for rescission advanced in the Jensens' complaint, and the theory upon which the action was tried, was the alleged fraudulent misrepresentations of J. L. Ledgett which induced the purchase. Ledgetts counterclaimed for

forfeiture of the contract and judgment on the note. The trial court, sitting without a jury, specifically found no false or fraudulent statements by the Ledgetts, but bottomed its judgment of rescission on the unargued theory of mutual mistake and allowed one month's payment of $700 to be retained by the vendors. The Ledgetts essentially contend that the evidence is insufficient to support the finding of a material, mutual mistake, and that the court improperly decided the case on the basis of a theory not raised by the pleadings. We affirm the judgment.

On May 5, 1973, the parties executed a contract for the sale of a large house and 8 acres, including a swimming pool. The terms of sale were $10,000 down and a balance of $75,000 at $700 per month.

The Jensens envisioned using the house as a vaguely described center for marriage counseling, day care, and "therapy and . . . rehabilitation problems, . . ." The home has five bedrooms and was intended to house several people, who were apparently to pay $300 per month in exchange for room and board and treatment. Several "investors" had contributed to the down payment, and one of these couples moved into the house in May as its first new occupants. Mrs. Jensen told Mr. Ledgett of their plans, including the fact that many people would occupy the house and that she hoped the condition of the premises would help qualify the program for a federal grant. Mr. Ledgett assured her the plumbing was "extra big" and would accommodate the number of people she expected.

For his part, Mr. Ledgett testified he showed the Jensens cracks in the basement floor and cement patio, a slight leak in the pool, and a "slow flush" and a leak in the bathroom adjacent to the master bedroom. These problems were purportedly caused by blasting incident to the widening of the nearby freeway.

The crucial problem unknown to the parties, however, was that the blasting had dislodged the sewer pipe from its entrance to the septic tank, so that much of the household sewage could not enter the tank. As long as the house was

occupied solely by the Ledgetts, the pipe dislocation had caused no apparent or easily discoverable problem. But the demands placed on the sewage system by nine people were too great, so that on or about June 20—several days after the Jensens and their daughter's family of five moved in— all the toilets began flushing slowly and backing up.

The situation became acute. Sewage accumulated in the bathtubs and on the basement floor to a depth of 4 inches. Some of it permeated the walls. The odor was unbearable. Mr. Ledgett told the Jensens a plumber would be coming soon to correct the "slow flush" and other minor problems, so they waited a few days after the overflows began before trying to contact Mr. Ledgett again. However, the Jensens had difficulty reaching the Ledgetts, the regular plumber was busy, and Mr. Ledgett neglected to pursue the matter, so that it was July 24 before the dislodged sewage line was discovered. The plumber's last visit was July 31, and the Jensens and others evacuated the house on August 10. Testimony conflicts as to whether the toilets worked properly when the Jensens departed, but there is no dispute that the odor persisted and that water, apparently from a swimming pool line, was still seeping into the basement. Incredibly, the Jensens never called a plumber themselves because they apparently expected Mr. Ledgett's plumber at any time and decided a different plumber would have difficulty locating the sewage lines.

■ We first take up the propriety of the trial court's resolution of the lawsuit on a theory not pleaded by the parties. CR 15 (b) provides as follows:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the plead-

ings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Where evidence raising issues beyond the scope of the pleadings is admitted without objection, the pleadings will be deemed amended to conform to the proof. *Robertson v. Bindel*, 67 Wn.2d 172, 406 P.2d 779 (1965). It is clear that the Jensens were mistaken on the adequacy of the plumbing to meet the expanded needs of the household, and Mr. Ledgett was likewise totally unaware of the system's deficiencies. Under the rule, a party may not permit without objection the introduction of evidence beyond the pleadings and thereafter claim error because the theory relied on for the judgment was not pleaded. *Moar v. Beaudry*, 62 Wn.2d 98, 381 P.2d 240 (1963). The issue of mutual mistake was tried by implied consent of the parties and was properly invoked by the court.

▇▇ We turn next to the key question. Was the mutual mistake sufficiently material to warrant rescission of the contract? The answer depends on whether the contract would have been entered into had the parties been aware of the problem. *Ross v. Harding*, 64 Wn.2d 231, 391 P.2d 526 (1964); *Davey v. Brownson*, 3 Wn. App. 820, 478 P.2d 258, 50 A.L.R.3d 1182 (1970).

The trial court found:

That there was a failure of the sewage system causing extensive damage to the basement and although there were problems with the swimming pool and leaks in the basement, the septic failure was the big factor and it was not unreasonable that Plaintiffs could not remain living there as the house was not adequate.

Further, it found

a mutual mistake that the facilities of this house were capable of functioning adequately, [and] there was such a

substantial failure that Plaintiffs should be entitled to rescind . . .

These findings are supported by substantial evidence, and we will not disturb them on appeal. *Grant v. Morris*, 7 Wn. App. 134, 498 P.2d 336 (1972). It is unlikely the Jensens would have purchased this house knowing that the sewage system was unable to serve nine people.

An approach to the resolution of mutual mistake cases under appropriate circumstances is that set forth in *Capital Savs. & Loan Ass'n v. Convey*, 175 Wash. 224, 227, 27 P.2d 136 (1933):

> Where the partial failure of consideration is slight in comparison with the whole consideration and the subject matter of the contract, where damages are easily ascertainable and the vendee can be thereby fully compensated, and where a rescission would be grossly inequitable to the vendor, the purchaser will not be permitted to rescind, but will be allowed a proportionate abatement from the purchase price.

*See Grant v. Morris, supra.*

In the case at bench, several of the elements cited above to justify damages instead of rescission are wanting. First, we cannot ascertain from the record what expense would have been entailed to restore the house to a livable condition. It appears that carpeting needed replacement; that further work was necessary on the sewage system, including the leaking pool line; and that fumigation—or perhaps replacement of entire walls—was in order. We do not agree that the $267.44 plumbing bill incurred for the completed repairs can be weighed against the total purchase price, because obviously an unknown additional restoration expense was necessary. Nor is rescission grossly inequitable to the vendors. The Ledgetts were allowed to keep 1-month's payment of $700 in exchange for the Jensens' unpleasant occupancy. Balanced against this is the notion that Jensens should also forfeit $8,000 cash and default a $2,000 note for the privilege of having endured the sewage problem for several weeks. Even allowing that Jensens should

sensibly have contacted their own plumber when the problem became acute, the equities favor them rather than their vendor whose reaction to the problem was rather casual.

The court's findings, based on substantial evidence, support its conclusion that rescission and concomitant return of the down payment were proper. *Pedrini v. Mid-City Trailer Depot, Inc.*, 1 Wn. App. 56, 459 P.2d 76 (1969).

Judgment is affirmed.

PEARSON, J., and ARMSTRONG, J. Pro Tem., concur.

Petition for rehearing denied July 15, 1976.