FILED
COURT OF APPEALS
DIVISION II

2015 APR 14 AM 9: 49

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| WOODS VIEW II, LLC, a Washington limited liability company; and DARLENE A. PIPER, a single woman, | No. 44404-6-II |
| Appellant and Cross-Respondent, | |
| v. | |
| KITSAP COUNTY, a Washington municipality, | UNPUBLISHED OPINION |
| Respondent and Cross-Appellant. | |

JOHANSON, C.J. — Appellants Woods View II, LLC (WVII) and Darlene Piper appeal from the superior court's grant of summary judgment in Kitsap County's (the County) favor on WVII's claims of negligence, tortious interference, and takings. These claims arise from the alleged delay of several permits and governmental decisions required for a project of WVII. WVII and Piper argue that (1) their claims are not barred by the statute of limitations, (2) Piper has individual standing, (3) the County's communications were not immunized as petitioning activity, (4) the County negligently delayed processing their development permit, (5) the County tortiously interfered with the various permitting processes involved in the project, and (6) the County's actions constituted a taking. On cross appeal, the County argues that (7) the Land Use Petition Act (LUPA), ch. 36.70C RCW, barred WVII's claims. Although we agree with WVII that its

claims are not barred by the statute of limitations, the trial court's summary dismissal of WVII's claims is affirmed.

## FACTS

This case involves a failed residential development, four decisions concerning the real property, and the timeliness of these decisions. Because this case is factually complex with a voluminous record, we begin by establishing the basic factual background and explaining the applicable administrative framework. Then, we discuss the facts that give rise to WVII's claims. Finally, we discuss the procedural history.

### I. BACKGROUND: THE WOODS VIEW PROJECT

The appellants are WVII and its managing member, sole owner, and agent Piper. WVII intended to build a residential development called "Woods View" on 19.76 acres in small "legacy lots"[1] in south Kitsap County. Piper was personally invested in the project: she was the sole owner of the construction company that would have served as the general contractor, she personally funded $350,000 in development expenses, and she personally guaranteed a $2,927,000 loan to WVII.

The Woods View project was highly controversial in the community. The county commissioners received many complaints about the development. Concerned citizens wrote to the County to complain about the project. One constituent characterized the development as a "mobile home park." Clerk's Papers (CP) at 445. The Woods View project was subjected to scrutiny by

---

[1] Each lot measures approximately 40 feet wide and 100 feet deep, that is, 1/10th of an acre. They are called "legacy lots" because they were platted in 1909 and are not compliant with current regulations which restrict development to a density of one unit per five acres. An owner is permitted to develop legacy lots, subject to certain restrictions.

not only the county commissioners, but also the governor's office, state legislators, and state agencies.

The County was sensitive to these concerns because it had faced frequent criticism for its land use decisions in the past. CP at 1265 (County commissioner noted in his deposition, "[T]he County gets picked on more than any other county in terms of any of the land use actions that it takes."). In fact, it had very recently been challenged before the Growth Management Hearings Board for failing to regulate "urban service" in rural areas.[2] *See Harless v. Kitsap County*, No. 07-3-0032, 2007 WL 4181033 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Nov. 15, 2007).

In an e-mail to a constituent who was upset about Woods View, County Commissioner Steve Bauer indicated that "the County staff and elected officials believe that they have *actively worked to find ways within the law to deny this project.* I don't think anyone can look at this project and conclude that it is either good for the area or consistent with current land use standards." CP at 436 (emphasis added).

## II. BACKGROUND AND HISTORY

At issue are four decisions regarding (1) a "Site Development Activity Permit" (SDAP), (2) a State Environmental Policy Act (SEPA), ch. 43.21C RCW, review, (3) state approval of a "Large On-Site Sewer System" (LOSS), and (4) a modification to the LOSS decision. All four decisions were made in WVII's favor and WVII does not challenge the decisions themselves. Rather, WVII alleges that the permits or decisions were granted *too slowly* as a direct and indirect result of the County's actions. We briefly explain the pertinent history below.

---

[2] The challenge was not successful. *Harless v. Kitsap County*, No. 07-3-0032, 2007 WL 4181033, at *5 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Nov. 15, 2007).

### A. Site Development Activity Permit (SDAP) and State Environmental Policy Act (SEPA): 2006-2007

The Woods View project required the County Department of Community Development (DCD) to issue a SDAP. Kitsap County Code (KCC) 12.10.030. Similarly, local government is obliged to carry out a SEPA review and issue a determination of significance (DS), a determination of nonsignificance (DNS), or a mitigated determination of nonsignificance (MDNS). *City of Fed. Way v. Town & Country Real Estate, LLC*, 161 Wn. App. 17, 53, 252 P.3d 382 (2011) (citing *Moss v. City of Bellingham*, 109 Wn. App. 6, 15, 31 P.3d 703 (2001), *review denied*, 146 Wn.2d 1017 (2002)); WAC 197-11-310(5)(a), (b), -340, -350(3); RCW 43.21C.030. Under the existing County ordinances, the County was required to provide a final decision within 78 days of the date it deemed the application complete.[3] Former KCC 21.04.110(A) (1998).[4]

WVII completed its SEPA "application" on April 14, 2006, and its SDAP application on May 5, 2006.[5] The County issued a MDNS on January 4, 2007. The SDAP was issued on December 10, 2007. Community groups appealed both decisions to the hearing examiner and the Kitsap County Superior Court, but their appeals were rejected.[6] According to WVII, the hearing

---

[3] As we further discuss in the statute of limitations section, the time limit is tolled when the County requires the applicant to "correct plans, perform studies, or provide additional information." Former KCC 21.04.110(A)(4)(a) (1998).

[4] This ordinance was repealed by Kitsap County Ordinance No. 490 (2012).

[5] This would make the County's action on the SEPA application due 78 days from April 14, and action on the SDAP application due 78 days from May 5—excepting periods during which the applicant was required to submit additional information. However, WVII complains only that the SDAP was issued late.

[6] WVII relied on the County's delay in its argument against these appeals, stating that "the County was doing a good and careful job." CP at 1360.

examiner was also tardy, hearing argument on March 20, 2008, and filing a decision on June 6, 2008.[7]

## B. ORIGINAL LOSS PROPOSAL: 2006-2008

A LOSS is a type of waste treatment system that serves multiple lots. Unlike the SDAP and SEPA review, the LOSS was not absolutely necessary for the project to move forward, but it would have allowed Woods View to double its density. With the LOSS, Woods View could support 78 single-family homes. Without the LOSS, Woods View could support only 39 homes using individual septic systems.

The state Department of Health (DOH) is responsible for evaluating LOSS applications. WAC 246-272B-02150. The County has no direct authority to approve or disapprove a LOSS system. Nevertheless, the then-existing administrative code required a LOSS to comply with local land use standards. *See* former WAC 246-272B-08001(2)(a)(ii) (2003).[8] Accordingly, while the DOH always had primary responsibility for passing on a LOSS application, it communicated with the County regarding WVII's application for a LOSS permit, as we explain further below.

At the relevant time, the DOH rules imposed requirements on the LOSS system's management depending on how the land serviced by the LOSS would be used. Where the lots were individually owned, a LOSS could only be managed by a public entity or a private operator guaranteed by a public entity. Former WAC 246-272B-08001(2)(a)(vi)(A)(I) (2003). But if the

---

[7] WVII asserts that a former county ordinance, in effect during the relevant time period, required hearing examiners to make a decision within 14 days of hearing argument. The current version imposes no such deadline. KCC 21.04.080.

[8] This section of the Washington Administrative Code has since been repealed by Wash. St. Reg. 11-12-050 (Jul. 1, 2011).

lots were under single ownership, either a public entity or a private entity could manage the LOSS. Former WAC 246-272B-08001(2)(a)(vi)(A)(II) (2003). One such public entity was the Karcher Creek Sewer District (KCSD). WVII initially approached KCSD to manage the LOSS for Woods View, and on September 29, 2006, KCSD issued a "Binding Sewer Availability" letter good for one year. But on December 1, 2006, WVII indicated that it had decided to use a "DOH approved private management entity" instead. CP at 135.

WVII requested a LOSS permit at some time in 2006. DOH granted the LOSS permit on March 19, 2008, conditioned on the Woods View lots being held by a single owner. At first, WVII agreed to the condition and recorded a "Covenant to Retain Single Ownership" on the same day. But WVII soon found the single-owner condition a barrier to financing: it approached the Legacy Group (Legacy) for a business loan, but Legacy "liked the project as depicted with an individual owner model" and found DOH's conditions made the project a "non-starter." CP at 125. As such, WVII decided to petition DOH for a modification to its LOSS permit that would allow the lots to be sold individually.[9]

### C. MODIFIED LOSS PROPOSAL (2009-2010)

WVII submitted all necessary documents for its modified LOSS proposal in November 2009. Richard Benson, the DOH engineer who initially worked on the Woods View permit, indicated that DOH could make the change "in a matter of a week to two weeks except that if the county had objections to it, he said, quote-unquote, 'I'm going to have to dot my i's and cross my

---

[9] Specifically, the new LOSS proposal involved management by a private entity guaranteed by a public entity. This would bring the LOSS under former WAC 246-272B-08001(2)(a)(vi)(A)(I) and allow individual ownership of the lots.

t's and we'll have to go through the full process and it could take up to six months to a year.'" CP at 1846. The modified LOSS was not approved until August 24, 2010.

### III. ALLEGED WRONGFUL ACTIONS BY THE COUNTY

WVII alleges that the County caused the aforementioned delays as part of a deliberate plan to undermine the Woods View project. While WVII points to many instances of the County's alleged intermeddling, its facts can be reduced to three main courses of conduct: communications with DOH, communications with third parties, and internal delays. We explore these courses of conduct in turn.

### A. COMMUNICATIONS WITH DOH

In an internal County e-mail, a deputy prosecutor proposed "a 'loop' with the state to ensure that the county is not allowing urban development in a rural area." CP at 433. Specifically, the County's attorney told her colleagues that

> even though [the Woods View project] is "vested" it is not conforming to our current plan. Thus, if the state were to inquire of DCD whether this meets our plan - DCD could say no, and the state would have to deny it.

CP at 433.

As described above, the state did not deny the LOSS permit. Still, the record indicates that the "issue of compliance with current land use standards" was a "significant issue that [DOH was] grappling with" and was a "relatively important issue in the final approval." CP at 1631. During the pendency of both of WVII's LOSS applications, the County remained in contact with DOH. On November 14, 2007, the deputy prosecutor e-mailed DOH a Growth Management Hearings

Board decision, which Benson understood to mean "they all want me to enforce [the County's land use standards] directly."[10] CP at 663.

In a letter dated December 3, 2007, the director of the county DCD referenced the same Growth Management Hearings Board decision, which explained that land-use densities as determined by the County in its GMA Land Use Plan and zoning are the controlling factor in any review for septic systems, even if review is conducted by the state. He told DOH that WVII did not meet current designations, but was a legal nonconforming use because the proposed LOSS was to serve lots that, while legally created prior to the enactment of the GMA, did not meet current county comprehensive plan or zoning designations for the area. DCD closed the letter by stating that it was merely informing DOH as to the Growth Management Hearings Board's decision, but that it was not advocating any specific action, leaving that to the state's discretion.

Then, when DOH was "near approval after a lengthy review process" (CP at 343), county representatives met with DOH on March 12, 2008. The County told DOH that the Woods View project should not be approved

> because the over-all development is not consistent with the County's and GMA's land use designations. They assert this violates the State's duty to ensure projects are consistent with local planning.
> . . . However, the County sees that it has no authority to deny the project.

CP at 340. The County did request that DOH condition the LOSS permit on single ownership of the Woods View lots.

---

[10] As Benson later clarified at deposition, he understood the e-mail to mean that he should not approve the LOSS because it did not conform with the County's land use requirements.

As described above, DOH issued WVII's LOSS permit with the requested single-ownership condition a week after the meeting.

When WVII made its modified LOSS proposal, the County's attorney sent the Attorney General's Office a series of e-mails between September 3 and September 10, 2009, expressing concern about the amendments. The County's attorney believed that WVII's requested permitting change was an "'after the fact' change, outside the public process, and is [sic] essentially is circumventing the law. We feel it cannot be approved and are hereby lodging our objections." CP at 351.

On September 3, 2009, Benson e-mailed the county DCD to check if WVII would be "a violation of county code" and confirm whether DCD would oppose the development. CP at 417. DCD e-mailed back on September 15 to state that "urban levels of service are being provided outside an urban growth area, which is inconsistent with the County's comprehensive plan and the Growth Management Act." CP at 417. That same month, DOH required WVII to submit renewed proof that it was in compliance with local land use standards. In March 2010, DOH transferred WVII's LOSS application from Benson to a different examiner who was not aware of the County's objections. It was this second examiner who ultimately approved the revised LOSS five months later.

B. COMMUNICATIONS WITH THIRD PARTIES

In September of 2007, KCSD did not renew its agreement to manage the Woods View LOSS. WVII alleges that this nonrenewal occurred because the County intimidated KCSD. Specifically, on June 7, 2007, county representatives met with KCSD and opined that KCSD was

not permitted to own or operate a LOSS in a rural area. The County was concerned about being sued by neighboring property owners. KCSD disagreed with the County's legal position.

The County indicated that "if the District decided to own and/or operate the LOSS, Kitsap County could not tell KCSD not to." CP at 835. But the County then declared a moratorium to preclude the use of a LOSS in rural areas, thereby preventing entities like KCSD from participating in projects like Woods View. KCSD determined that it "did not wish to own or operate the LOSS for Woods View if Kitsap County had an ordinance prohibiting it." CP at 835. KCSD's withdrawal left WVII without a public operator for its LOSS.

Furthermore, WVII argues that it would have received development loan financing from Legacy but for the County's actions. Legacy had committed to a loan but had second thoughts when, as part of its due diligence, Legacy had a conference call with county officials. The County told Legacy that "the ownership change was a 'big change of use' and that it could necessitate hearings and delay timelines." CP at 124. But the County did not know what DOH was going to do. On the other hand, Legacy also indicated that

> [t]he County did not give us assurances of how the DCD process would play out . . . we did not feel as though the County actors tried to discourage our consideration of loaning to Woods View II LLC and did not perceive the County as trying to inject itself into our business relationship with Woods View II LLC or Ms. Piper.

CP at 124-25. Following the call with the County, Legacy declined to fund the loan.

### C. COUNTY'S INTERNAL DELAY

WVII alleges that the County was purposely slow to issue its SDAP permit, but points to only one specific act by the County. On October 13, 2006, Kitsap County Administrator Cris Gears sent the state Department of Commerce, Trade, and Economic Development (CTED) a letter expressing concern whether the WVII LOSS would be a "'public sewer system'" pursuant to WAC

10

242-272-01001 [sic], and whether it would allow "the development of urban densities outside an urban growth area in violation of RCW 36.70A.110(4) and RCW 57.16.010(6)." CP at 322. Pending a response to that letter, the County allegedly suspended the processing of WVII's SDAP application. CTED responded to Gears's letter on November 3, 2006.[11]

## IV. PROCEDURAL HISTORY

But for the aforementioned delays, WVII asserts that the Woods View lots could have been available for sale as early as May 2008. As it is, by 2009, the real estate market had become unfavorable. The Woods View business loan went into default. On December 31, 2009, the Woods View property went into foreclosure. Piper herself went bankrupt in May 2010 and was discharged. WVII estimates that the delays cost WVII somewhere between $2.55 million and $4.37 million and personally cost Piper somewhere between $1.39 million and $1.56 million.

On October 14, 2009, WVII and Piper served a notice of claim[12] on the County. On December 18, 2009, WVII and Piper filed a lawsuit in superior court asserting federal due process and takings claims as well as state law torts. The County removed the suit to the U.S. District Court for the Western District of Washington in Tacoma. There, the judge dismissed the federal constitutional claims with prejudice and dismissed the state claims without prejudice. A year later, the Ninth Circuit Court of Appeals affirmed this decision on different grounds. The Ninth Circuit disagreed with the ripeness analysis, but agreed with the each subsequent ruling. Specifically, the

---

[11] CTED told Gears that "if the proposed on-site system serves urban levels of development, we believe it is consequently an urban level of service . . . which is contrary to the purpose of the Rural Residential zone." CP at 610.

[12] Former RCW 4.96.020 (2009).

Ninth Circuit held that WVII's substantive due process claims failed because "it is at least fairly debatable that Appellees' delays in issuing the SDAP and SEPA approvals were rationally related to a legitimate governmental interest in ensuring that local development complied with state law." CP at 1476.

On July 18, 2011, WVII refiled its complaint in state court alleging negligence, tortious interference, and unconstitutional takings and requesting a declaratory judgment and injunctive relief.[13] The County filed a motion for summary judgment to dismiss all of WVII's claims, which the superior court denied.

In a second motion for summary judgment, the County requested dismissal of WVII's tortious interference and negligence claims. In a supplemental brief to the superior court, the County also requested dismissal of the takings claim. On December 12, 2012, the superior court dismissed all of WVII's claims. This appeal followed. The County raised a LUPA issue on cross appeal.

## ANALYSIS

This case involves multiple theories of liability that apply to many of the same facts. We discuss procedural issues first. Then, we discuss the three substantive issues—negligence, tortious interference, and takings.

### I. STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. *Mohr v. Grantham*, 172 Wn.2d 844, 859, 262 P.3d 490 (2011). We will affirm the summary judgment only if there is no genuine issue

---

[13] The parties have stipulated to dismiss the claims for declaratory judgment and injunctive relief as well as the County's counterclaim for malicious prosecution.

of material fact and the moving party is entitled to judgment as a matter of law. *Qwest Corp v. City of Bellevue*, 161 Wn.2d 353, 358, 166 P.3d 667 (2007). However, the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." CR 56(e).

On review of a summary judgment, the evidence is reviewed in the light most favorable to the nonmoving party, and all reasonable inferences from that evidence are drawn in favor of the nonmoving party. *Qwest*, 161 Wn.2d at 358. If reasonable minds can differ on facts controlling the outcome of the litigation, then there is a genuine issue of material fact and summary judgment is improper. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). Summary judgment is also improper if the issue at bar requires the weighing of "competing, apparently competent evidence," in which case this court will reverse and remand for a trial to resolve the factual issues. *Larson v. Nelson*, 118 Wn. App. 797, 810, 77 P.3d 671 (2003).

## II. STATUTE OF LIMITATIONS

The County argues that WVII's claims for negligence and tortious interference are barred by the three-year statute of limitations. The County argues that it was required to issue a decision on the SDAP application and SEPA threshold decision by July 22, 2006, and that its failure to do so started the statute of limitations running, meaning that the statute of limitations expired on July 22, 2009. WVII argues that its tortious interference claim did not accrue until late October 2006 when it first became aware of the facts that would support a tortious interference claim. WVII further argues that its negligence and tortious interference claims arising out of the County's delay did not accrue until December 2006 as the County's requests for further information extended the statutory deadline for the County to process its application and, thus, the time when the County

13

was in violation of the ordinance.[14] We agree with WVII and hold that WVII's claims are not barred by the statute of limitations.[15]

The statute of limitations for negligence and tortious interference is three years. RCW 4.16.080(2). The statute of limitations begins to run when the plaintiff has a right to seek recovery in the courts. *Malnar v. Carlson*, 128 Wn.2d 521, 529, 910 P.2d 455 (1996). That is, the statute of limitations does not begin to run until every element of an action is susceptible of proof, including the occurrence of actual loss or damage. *Haslund v. City of Seattle*, 86 Wn.2d 607, 619, 547 P.2d 1221 (1976); *Mayer v. City of Seattle*, 102 Wn. App. 66, 76, 10 P.3d 408 (2000), *review denied*, 142 Wn.2d 1029 (2001).

WVII bases its claims, in part, on the County's delay in issuing the SDAP and in affirming the SDAP issuance on appeal.[16] As WVII points out, the County exceeded time limits imposed by its own ordinances. *See* former KCC 21.04.110(A)(4)(a) (1998). As Division One of this court has recognized, where a claim arises out of a permitting body's failure to comply with statutory time limits, the cause of action does not accrue until the time limit is *actually exceeded*. *Birnbaum v. Pierce County*, 167 Wn. App. 728, 734, 274 P.3d 1070, *review denied*, 175 Wn.2d 1018 (2012).

---

[14] WVII argues, and the County does not dispute, that the 10-year statute of limitations for its taking claim has not run.

[15] Accordingly, we do not reach WVII's alternative theory that the continuing tort doctrine prevented the statute of limitations from running until the County's allegedly tortious conduct ended.

[16] The County does not appear to dispute that the hearing examiner's failure to timely make a decision on the SDAP appeal fell within the statute of limitations.

Here, WVII completed its SDAP application on May 5, 2006. Former KCC 21.04.110(A) required a decision within 78 days of the application becoming complete. As the County points out, that would make its SDAP decision due on July 22, 2006—more than three years before WVII submitted its claims to the County. But that is not the whole story because former KCC 21.04.110(A)(4)(a) also excludes

> [a]ny period during which the applicant has been required by the county to correct plans, perform studies, or provide additional information. The period shall be calculated from the date the county notifies the applicant of the need for additional information to the earlier of either: (1) the date the county determines whether the additional information provided satisfies the request for information; or (2) fourteen days after the date the information has been provided to the county.

Here, the County made two such requests for additional information. First, on or prior to July 13, 2006, the County requested information about "two possible 'depressions' on the property which may have been protected streams." CP at 1955. WVII provided the requested information on July 19, 2006. The County did not respond, so the time limit would have begun to run 14 days after July 19, 2006—that is, August 2, 2006.

But on July 31, 2006, the County again requested additional information. WVII provided the requested information on November 20, 2006. Again, the County did not respond, meaning that the time limit did not start running again until 14 days after November 20, 2006—that is, December 4, 2006.

Accordingly, the 78-day time limit on the County's permitting decisions began to run on or about May 5 and excluded the period between July 13, 2006 and August 2, 2006, as well as the period between July 31, 2006 and December 4, 2006. This calculation means that approximately 10 of the 78 days remained. Therefore, any claim for delay of the SDAP permit did not accrue

until December 13, 2006, the earliest date the County was in violation of its own time limit ordinance. That is less than three years before WVII presented its tort claims on October 14, 2009.

The County's only response to this argument is that it was not raised until the second supplemental brief in the superior court and contradicted WVII's earlier pleadings.[17] But "[w]here evidence raising issues beyond the scope of the pleadings is admitted without objection, the pleadings will be deemed amended to conform to the proof." *Jensen v. Ledgett*, 15 Wn. App. 552, 555, 550 P.2d 1175 (1976) (citing *Robertson v. Bindel*, 67 Wn.2d 172, 406 P.2d 779 (1965)). The County did not object to WVII's tolling argument and, thus, waived the issue.

WVII's negligence claim arising out of the delay on its SDAP application was not time barred. Because WVII's tortious interference claim arises in part from the delay, it also complies with the statute of limitations. We conclude that WVII's negligence and tortious interference claims are not barred by the statute of limitations.

### III. STANDING

The County argues that Piper has no standing to litigate any harm WVII suffered because she was a mere shareholder and guarantor of the WVII LLC. We agree and, therefore, affirm the superior court's dismissal of Piper's claims.

Generally, a party can only litigate a claim if she has a "'present, substantial interest'" in its outcome and can show that she will be "'benefited by the relief granted.'" *State ex rel. Hays v.*

---

[17] The County also argues that the contention that the delay claim accrued in December is inconsistent with the claim that it was wrongful to suspend processing of the SDAP starting in October 2006. Perhaps, but this does not make WVII's statute of limitations analysis any less correct. Furthermore, as WVII argues, the County could have continued processing other portions of the SDAP application even while waiting on a response to Gears's letter.

*Wilson*, 17 Wn.2d 670, 672, 137 P.2d 105 (1943) (quoting 39 AM. JUR. *Parties* § 10, at 860 (1942)). But shareholders and guarantors attempting to assert standing in the name of a corporation or principal face a higher hurdle.

Shareholders are usually not allowed to bring an individual direct cause of action for an injury inflicted upon the corporation or its property by a third party. *United States v. Stonehill*, 83 F.3d 1156, 1160 (9th Cir.) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949); *Sutter v. Gen. Petroleum Corp.*, 28 Cal. 2d 525, 530, 170 P.2d 898 (1946); *Jones v. H.F. Ahmanson & Co.*, 1 Cal. 3d 93, 81 Cal. Rptr. 592, 597-99, 460 P.2d 464 (1969)), *cert. denied*, 519 U.S. 992 (1996). The exception to this rule occurs where the shareholder's claim arises from "something other than his shareholder status." *Sound Infiniti, Inc. v. Snyder*, 145 Wn. App. 333, 352, 186 P.3d 1107 (2008) (emphasis omitted), *aff'd*, 169 Wn.2d 199, 237 P.3d 241 (2010). Thus, Division One of this court recognizes two exceptions to the usual rule against shareholder standing: "(1) where there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder; and (2) where the shareholder suffered an injury separate and distinct from that suffered by other shareholders." *Sabey v. Howard Johnson & Co.*, 101 Wn. App. 575, 584-85, 5 P.3d 730 (2000). Similarly, Division One has held that "a guarantor must show a distinct and different injury before an independent action can be maintained." *Miller v. U.S. Bank of Wash., N.A.*, 72 Wn. App. 416, 423, 865 P.2d 536 (1994) (citing *Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 640 (9th Cir. 1988)).

The causes of action in this case arose out of WVII's relationships with regulatory agencies and potential business partners. Piper herself was not a party to any of these relationships, and the fact that she negotiated or executed contracts on behalf of WVII does not make her a party. *Hunter*

*v. Knight, Vale & Gregory*, 18 Wn. App. 640, 644-45, 571 P.2d 212 (1977), *review denied*, 89 Wn.2d 1021 (1978). Rather, WVII acquired the property and applied for the permits. CP at 1392 ("Q. And for all the important things that happened in this development, it was Woods View II that was the owner; correct? A. Yes.").

WVII argues that Piper suffered a separate and distinct injury because the failure of the Woods View project resulted in a nonjudicial foreclosure that extinguished WVII's liability but preserved the right to pursue a deficiency judgment against Piper as guarantor. WVII further points to debts that Piper personally guaranteed in Norpac Construction, LLC's favor, which also went into default because the Woods View project failed. Finally, WVII points to various creditors who filed suit against Norpac and Piper, but not WVII.

But these facts are properly analyzed as consequential damages that would not have happened but for the primary harm to WVII. A shareholder does not have standing to recover consequential damages that result from the harm to her corporation. *Stonehill*, 83 F.3d at 1160. The fact that Piper was the sole shareholder of WVII does not change our analysis: a sole shareholder, by necessity, cannot show "an injury distinct from that to other shareholders." *Sparling*, 864 F.2d at 641.

Piper has not established an exception to the shareholder standing rule. Therefore, she lacks standing.[18]

---

[18] Accordingly, we do not reach the issue of whether Piper was collaterally estopped from litigating the issue of standing.

No. 44404-6-II

On cross appeal, the County argues that its permitting actions can be challenged only through a LUPA appeal and that WVII's failure to bring an action under LUPA bars any damages actions arising from its permitting activity.[19] WVII argues that LUPA does not bar its action because it is seeking monetary compensation rather than a modification of a land use decision, and its action is not a superior court review of an administrative decision. We agree with WVII. LUPA does not bar this action.

LUPA is normally the exclusive remedy for land use decisions. RCW 36.70C.030(1). But LUPA does not apply to "[c]laims provided by any law for monetary damages or compensation." RCW 36.70C.030(1)(c). This is not a strict bar—as this court has recognized, a damage claim may still be controlled by LUPA if it is dependent on "an interpretive decision regarding the application of a zoning ordinance." *Asche v. Bloomquist*, 132 Wn. App. 784, 801, 133 P.3d 475 (2006), *review denied*, 159 Wn.2d 1005 (2007). Further, even if an applicant obtains the requested permit approval, he still must file a LUPA appeal if he intends to challenge the propriety of any conditions placed on issuance of the permit. *James v Kitsap County*, 154 Wn.2d 574, 590, 115 P.3d 286 (2005).

This case is not like *Asche* nor *James*, however. WVII is not challenging the actual land use decisions below because it received all of the permits it asked for nor is it challenging any conditions imposed. Instead, this case is analogous to *Lakey v. Puget Sound Energy, Inc.*, 176

---

[19] The County's brief indicates that it's cross notice of appeal is intended only to preserve arguments from its first summary judgment motion and that the County seeks no relief other than the affirmance of the summary judgment below.

Wn.2d 909, 296 P.3d 860 (2013). There, the Supreme Court ruled that the appellants were not required to file a LUPA petition to pursue their claims for damages where the appellants were only seeking money compensation rather than a reversal or modification of a land use decision. Further, the Supreme Court held that because LUPA provides for judicial review of a local jurisdiction's land use decision and the appellants were making a claim that they could not raise before the hearing examiner, appellants were not invoking the superior court's appellate jurisdiction and LUPA did not govern their claim. *Lakey*, 176 Wn.2d at 927-28.

Similarly, all WVII seeks is *damages* for the *delay* in rendering those decisions. In such a case, LUPA is not a bar to the plaintiff's claims. *Libera v. City of Port Angeles*, 178 Wn. App. 669, 675 n.6, 316 P.3d 1064 (2013). LUPA does not bar WVII's claims here and we reject the County's LUPA cross appeal.

## V. NEGLIGENCE / PUBLIC DUTY DOCTRINE

WVII argues that the County's delay in processing its SDAP and issuing the MDNS fell short of the standard of care for municipalities in the course of their permitting responsibilities. We agree with the County's public duty doctrine arguments and affirm the summary judgment as to WVII's negligence claim.

Every negligence action requires a showing of "a duty of care running from the defendant to the plaintiff." *Honcoop v. State*, 111 Wn.2d 182, 188, 759 P.2d 1188 (1988). Where the defendant is a government entity,

> the public duty doctrine provides that a plaintiff must show the duty breached was owed to him or her in particular, and was not the breach of an obligation owed to the public in general, i.e., a duty owed to all is a duty owed to none.

20

*Munich v. Skagit Emergency Commc'n Ctr.*, 175 Wn.2d 871, 878, 288 P.3d 328 (2012) (citing *Babcock v. Mason County Fire Dist. No. 6*, 144 Wn.2d 774, 785, 30 P.3d 1261 (2001); *Beal v. City of Seattle*, 134 Wn.2d 769, 784, 954 P.2d 237 (1998)).

There are four exceptions to the public duty doctrine: (1) legislative intent, (2) failure to enforce, (3) the rescue doctrine, and (4) a special relationship. *Munich*, 175 Wn.2d at 879 (citing *Cummins v. Lewis County*, 156 Wn.2d 844, 853, 133 P.3d 458 (2006)). If any one of the exceptions applies, then the government owes the plaintiff a duty as a matter of law. *Munich*, 175 Wn.2d at 879. Here, WVII argues only the failure to enforce and special relationship exceptions are at issue, but we conclude neither exception applies.

## A. FAILURE TO ENFORCE

The failure to enforce exception applies when "[(1)] governmental agents responsible for enforcing statutory requirements [(2)] possess actual knowledge of a statutory violation, fail to take corrective action despite a statutory duty to do so, and [(3)] the plaintiff is within the class the statute intended to protect." *Bailey v. Town of Forks*, 108 Wn.2d 262, 268, 737 P.2d 1257, 735 P.2d 523 (1987). This exception is narrowly construed, so as to respect the policy of *Taylor v. Stevens County*, 111 Wn.2d 159, 165, 759 P.2d 447 (1988). *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 531, 799 P.2d 250 (1990).

In *Taylor*, our Supreme Court held that "building codes impose duties that are owed to the public at large." 111 Wn.2d at 165. That is, "building codes are designed to protect the public safety, health and welfare, not to protect individuals from *economic loss caused by public officials while carrying on public duties*." *Taylor*, 111 Wn.2d at 169 (emphasis added). *Taylor* purposely drew the scope of the public duty narrowly in order to avoid "dissuad[ing] public officials from

carrying out their public duty." 111 Wn.2d at 171. These same policy principles require this court to construe the failure to enforce exception narrowly as well.

WVII admits that no reported case has applied the failure to enforce exception in a case like this. Indeed, WVII raises the unusual theory that the statutory requirement that the County failed to enforce was its *own* mandate to issue a timely permit. We found no Washington case that has applied the failure-to-enforce exception where the defendant government entity fails to take corrective action against *itself.* Rather, the failure to enforce exception envisions a situation in which a regulator knowingly approves "inherently dangerous and hazardous conditions," *Pepper v. J.J. Welcome Constr. Co.*, 73 Wn. App. 523, 533-34, 871 P.2d 601, *abrogated by Phillips v. King County*, 87 Wn. App. 468, 943 P.2d 306 (1997), *review denied*, 124 Wn.2d 1029 (1994), or where a police officer fails to take an intoxicated driver into custody, *Bailey*, 108 Wn.2d at 264.

Also missing is any "mandatory duty to take specific action" to correct a violation. *Forest v. State*, 62 Wn. App. 363, 369, 814 P.2d 1181 (1991). While former KCC 21.04.110(A) does state that decisions "*shall* be issued not more than seventy-eight days after the date of the determination of completeness" (emphasis added), the ordinance does not tell the County what to do if it does *not*, in fact, issue a decision by that time. The reason for this is obvious—it is the judiciary, not the County, which is responsible for correcting the *County's* failure to abide by its own time limits. That is, any duty to correct the County's behavior is not vested in the County. Drawing the failure-to-enforce exception narrowly, as *Taylor* requires us to do, we hold that WVII has failed to show that the exception should apply.

## B. Special Relationship

The special relationship exception applies when "(1) there is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) gives rise to justifiable reliance on the part of the plaintiff." *Taylor*, 111 Wn.2d at 166.

The first element, privity, is defined broadly—it refers to the relationship between a government agency and any reasonably foreseeable plaintiff. *Chambers-Castanes v. King County*, 100 Wn.2d 275, 286, 669 P.2d 451 (1983). Drawing all factual inferences in WVII's favor, we hold that WVII was a reasonably foreseeable plaintiff.

The second element requires that "a direct inquiry is made by an individual and incorrect information is clearly set forth by the government, the government intends that it be relied upon and it is relied upon by the individual to his detriment." *Meaney v. Dodd*, 111 Wn.2d 174, 180, 759 P.2d 455 (1988). An assurance is express only if it promises that a government official "would act in a specific manner." *Babcock*, 144 Wn.2d at 791. Furthermore, any express assurance must be unequivocal. *Meaney*, 111 Wn.2d at 180.

The third element—justifiable reliance—is a "question of fact generally not amenable to summary judgment." *Babcock*, 144 Wn.2d at 792.

WVII points to the County's statement that "it would process the application as a vested permit request, meaning that [WVII] should receive the permit under the land use requirements in place at that time." CP at 602-03. This may be an assurance that WVII would receive the SDAP permit, which it did. But it was not an assurance that WVII would receive the permit within a specific timeframe. Perhaps WVII had a reasonable expectancy that the SDAP permit would issue

23

within the 78-day time limit established by former KCC 21.04.110(A). If so, that expectancy was an *implied* assurance not an express one. WVII fails to point out what "incorrect information [was] clearly set forth" by the County. *Meaney*, 111 Wn.2d at 180. For that reason WVII's claim that the special relationship exception applies fails.

## C. CONCLUSION

Because neither of the asserted exceptions to the public duty doctrine (failure to enforce or special relationship) applies, the public duty doctrine bars negligence liability as a matter of law. WVII fails to establish that the County's duty to timely issue SDAPs was owed to WVII in particular rather than the public in general. As such, WVII's negligence claim fails at the outset, and summary judgment on the negligence claim was proper. As to WVII's negligence claim, we affirm the superior court's summary dismissal.

## VI. TORTIOUS INTERFERENCE

WVII argues that the County interfered with its business expectancies and contracts when it suspended the processing of WVII's SDAP application, caused KCSD to withdraw from its contract to manage the LOSS for WVII, communicated with DOH regarding WVII's pending LOSS permit, and delayed the approval process for the project. We disagree.

Tortious interference has five elements: (1) Business relationship/expectancy, (2) defendant's knowledge of relationship, (3) intentional interference resulting in termination of relationship, (4) improper purpose/means, and (5) damages. *Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 351, 144 P.3d 276 (2006). These elements are described in detail below.

24

We conclude WVII fails to show that the County's interference resulted in the termination of WVII's relationship with either KCSD or Legacy under prong (3). We further conclude that WVII is unable to show any genuine dispute as to a material fact regarding prong (4), whether the County acted with improper means or improper purpose regarding its business expectancy in the project. Accordingly, we decline to reach the issue of damages or proximate cause, and we affirm the superior court's order granting summary judgment on this claim.

A. ELEMENTS OF TORTIOUS INTERFERENCE

1. BUSINESS RELATIONSHIP OR EXPECTANCY

A developer has a protected business expectancy in its projects, which can give rise to a tortious interference claim. *Westmark Dev. Corp. v. City of Burien*, 140 Wn. App. 540, 557-58, 166 P.3d 813 (2007), *review denied*, 163 Wn.2d 1055 (2008). WVII's expectancy in its Woods View project satisfies the first element. Furthermore, WVII had business relationships with its prospective LOSS manager, KCSD, and its prospective lender, Legacy. Both KCSD and Legacy made an initial commitment to work with WVII. Drawing all factual inferences in favor of WVII, the nonmoving party, we hold that the first element of tortious interference is satisfied.

2. KNOWLEDGE OF RELATIONSHIP

The knowledge element is satisfied when the defendant knows of "facts giving rise to the existence of the relationship." *Calbom v. Knudtzon*, 65 Wn.2d 157, 165, 396 P.2d 148 (1964). This element does not require specific knowledge, only awareness of "some kind of business arrangement." *Topline Equip., Inc. v. Stan Witty Land, Inc.*, 31 Wn. App. 86, 93, 639 P.2d 825, *review denied*, 97 Wn.2d 1015 (1982). Here, the County was certainly aware of WVII's business plans for the Woods View development. The County was also aware of WVII's business

relationships with KCSD and Legacy—that is the reason the County communicated with KCSD and Legacy. Drawing all factual inferences in WVII's favor, the second element is satisfied.

3. INTENTIONAL INTERFERENCE RESULTING IN TERMINATION OF RELATIONSHIP

a. KCSD

WVII alleges that the County interfered with WVII's business relationships with both KCSD and Legacy, as well as WVII's business expectancy in the Woods View project in general. It is true that the County communicated with both KCSD and Legacy, and it is true that both KCSD and Legacy terminated their business relationships with WVII. The question is whether the County's communications *caused* those business relationships to end. Even drawing all factual inferences in WVII's favor, a reasonable finder of fact could not find that the County *caused* the termination of WVII's relationships with KCSD and Legacy.

The County contacted KCSD in June 2007 to voice its concerns over the legality of the Woods View project. By that time, WVII had already decided of its own volition to abandon its relationship with KCSD and "move forward with using a DOH approved private management entity." CP at 135; *see also* CP at 139 ("[M]y client has not concluded a maintenance agreement with [KCSD] and at this point does not intend to do so."). Accordingly, whether or not KCSD acted on the basis of the County's legal arguments, it was not KCSD that ended the relationship with WVII but rather WVII itself. There is no genuine issue of material fact as to whether the County tortiously interfered with WVII's relationship with KCSD.

b. LEGACY

WVII's arguments with respect to Legacy are similarly unavailing. It is true that Legacy declined to fund WVII's loan after a conference call with the County. However, according to

Legacy's vice president, Brent Eley, the County did not express any opinion about whether the Woods View project or the associated permits would be approved and that Legacy "did not feel as though the County actors tried to discourage our consideration of loaning to Woods View II LLC and did not . . . try[] to inject itself into [Legacy's] business relationship with Woods View II LLC or Ms. Piper." CP at 124-25. Eley's testimony unambiguously shows that the County did not cause Legacy to decline to fund WVII's loan. WVII fails to present any evidence that would lead a reasonable finder of fact to disbelieve Eley's account. Accordingly, we hold that WVII has failed to show specific facts that would create a genuine issue of fact regarding the County's alleged tortious interference with WVII's relationship with Legacy. CR 56(e).

### c. WOODS VIEW BUSINESS EXPECTANCY

WVII argues that the County's own delay, as well as delay that the County caused DOH to incur, caused the Woods View project to fail. Even assuming without deciding that WVII establishes intentional interference resulting in termination of relationship, WVII fails to establish a genuine dispute as to prong (4) improper purpose/means. Accordingly, we need not analyze further whether the County's interference resulted in termination of the project.

### 4. IMPROPER PURPOSE OR MEANS

The fourth element may be satisfied by proving either that the defendant had an improper purpose *or* that the defendant used improper means. The terms are not synonymous: this court has recognized that

> in government delay cases, proving improper purpose requires showing that the defendant delayed plaintiff with the purpose of improperly preventing plaintiff's land development, and proving improper means requires showing that the defendant arbitrarily singled out for delay a particular plaintiff or type of plaintiff.

27

*Libera*, 178 Wn. App. at 677 (citing *Pleas v. City of Seattle*, 112 Wn.2d 794, 804-06, 774 P.2d 1158 (1989); *Westmark*, 140 Wn. App. at 560-61). Accordingly, to prove that the County interfered to further an improper purpose or by virtue of an improper means, WVII must demonstrate not only that the County did interfere but that it had a duty not to interfere. *Libera*, 178 Wn. App. at 676. We conclude that WVII fails to raise a genuine issue of material fact as to improper purpose and improper means.

a. IMPROPER MEANS

WVII's argument with regard to improper means is threefold. Attempting to draw analogies to *Westmark*, WVII takes issue with (1) the additional delay caused by the County's suspension of the application process while it waited for the state to respond to one of its inquiries, (2) the County's interference with KCSD, which caused KCSD to terminate its relationship with WVII, and (3) the delay caused by the County's correspondence with DOH, including its repeated representations that the development did not comply with the GMA and the County's comprehensive plan.

In the permitting context, one example of an improper means is imposing an extraordinary delay. *Westmark*, 140 Wn. App. at 560. WVII relies heavily on *Westmark*, an instructive decision, but one that is nevertheless distinguishable from the facts here. In *Westmark*, a plaintiff in unincorporated King County applied to King County for a permit to build an apartment complex. 140 Wn. App. at 543-44. While the application was pending and when King County was nearly ready to make a decision on the developer's permit, the city of Burien incorporated the area and assumed permitting responsibility. *Westmark*, 140 Wn. App. at 544. The city then delayed

approving the developer's permit for a period of years when the typical response time was 30 to 120 days. *Westmark*, 140 Wn. App. at 561.

The evidence revealed that Burien had incorporated in part to stop the development of apartment buildings and that the specific development at issue was one of only a few proposed projects that Burien took over when there were as many as 100 others pending in the area. *Westmark*, 140 Wn. App. at 559. The *Westmark* court found that Burien had employed improper means to delay the permitting process. 140 Wn. App. at 560.

Specifically, the city's SEPA decision took more than 3 years when ordinarily it should take between 30 and 120 days. *Westmark*, 140 Wn. App. at 561. City employees made decisions that resulted in additional delay without ever having reviewed the project's files. *Westmark*, 140 Wn. App. at 559. And despite the fact that the developer immediately provided any requested information, Burien would not provide straight answers. *Westmark*, 140 Wn. App. at 560-61.

Here, the County took 19 months to issue a SDAP when, by ordinance, the decision should take no more than 78 days. Former KCC 21.04.110(A). But the delays here, unlike those in *Westmark*, were not caused by the County's use of "improper" means. The record demonstrates that the County did temporarily suspend the application process, but the County did so only because it anticipated guidance from the state and then Governor Gregoire regarding what the County felt was an untenable position.

The County wrote a letter to the governor in which it recognized the conflict that arose where (as here) a sewer system designed for urban use was nevertheless permitted to serve a rural area by virtue of the fact that those areas involved "pre-GMA vested lot[s]." CP at 901. Understandably, the County was hesitant to proceed with the WVII permitting process because it

believed doing so made it susceptible to liability for violating the GMA. Even though the vested rights doctrine rendered the County powerless to deny WVII building permits, it became aware that extending urban services outside urban growth areas was contrary to current GMA goals and policies. WVII fails to show how the delay caused by the County's reasonable appeal to the State for guidance constitutes "improper means" for the purpose of a tortious interference claim.

Moreover, WVII's allegation that the County improperly injected itself into dealings between KCSD and WVII, causing the relationship to deteriorate, is unpersuasive. WVII is correct that the County expressed its displeasure with the notion that KCSD would serve as the owner or operator of the LOSS for WVII. But again, the County did so because it was of the opinion that the controlling statutes and regulations did not permit an entity like KCSD to manage the LOSS. The County also stated unequivocally that despite its position, it could not prevent KCSD from reaching an agreement with WVII should it decide to. Furthermore, by the time the County expressed its sentiment to KCSD, WVII had already indicated that it had decided to use a "DOH approved private management entity" instead. CP at 135. WVII again fails to show that the County interfered using "improper means."

Finally, WVII alleges that the County interfered with the development in part by "falsely" telling DOH that the development did not comply with applicable land use designations. But in context, the County simply relayed its concern that the project appeared inconsistent with the GMA and in potential violation of the State's duty to ensure that approved projects are consistent with local planning mandates. And again, the County expressly reminded DOH that the County had no authority to deny the project. Furthermore, the County's position that the LOSS did not comply with the GMA was accurate. The GMA endeavors to prohibit the extension of urban services to

30

rural areas. RCW 36.70A.110(4). We conclude that even reviewing the evidence in WVII's favor, the delays here do not rise to the level of "extraordinary" delay by use of improper means as contemplated by *Westmark*.

Another example of an improper means is singling out a project by imposing additional requirements not contained in the applicable statute. *Pleas*, 112 Wn.2d at 796-97. But here, the County did not and could not impose the single ownership condition. That decision rested with the DOH. WAC 246-272B-02150. WVII also failed to show that the County singled out its proposed development in the permitting process as compared to other similarly situated projects. Unlike the facts in *Westmark*, WVII does not attempt to show that the County's alleged interference with DOH was limited to its development efforts or even to its type of development. In other words, the County could consistently issue the development permits and argue to DOH that an on-site sewer system serving a high density site in a rural area should not be approved by DOH because it is inconsistent with the County's current comprehensive plan and the GMA's provisions regarding development outside an urban growth area. This is a rational position for the County to take. The County argues that its statements cannot constitute improper means because the County was "merely asserting an arguable interpretation of existing law." *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997). We agree with the County that WVII fails to show a material issue of fact as to whether the County arbitrarily singled out for delay WVII's development.

b. IMPROPER PURPOSE

While improper purpose and improper means are separate inquiries, "impropriety may be more easily found if the means of interference was wrongful." *Pleas*, 112 Wn.2d at 806. Where

31

a municipality singles out a project, it is an improper purpose to do so for the purpose of political advantage, such as placating a state representative or a community group. *Westmark*, 140 Wn. App. at 560; *Pleas*, 112 Wn.2d at 796.

In *Pleas*, our Supreme Court identified an improper purpose for the sake of a tortious interference claim where the city of Seattle actively obstructed an apartment complex project specifically to gain the favor of politically active and influential organizations. *Pleas*, 112 Wn.2d at 805. The city consistently delayed processing the application to correspond with a group of concerned citizens, defied court orders to continue to process the project's application, encouraged the citizen's group to petition for a favorable rezone to block the project, and otherwise bypassed ordinary procedures to appease its constituents. *Pleas*, 112 Wn.2d at 796-800. And in *Westmark*, Burien obstructed the apartment building in part to please a state representative who lived near the proposed site and actively opposed the development. 140 Wn. App at 560.

Here, although there was considerable community opposition to the WVII development, this fact alone does not indicate that the County intentionally caused delay for the sole purpose of placating its constituents. Commissioner Bauer did tell a constituent that the "County staff and elected officials believe that they have actively worked to find ways within the law to deny this project." CP at 436. But this statement was only a small portion of an otherwise lengthy e-mail sent to a concerned citizen to explain why the County could not prevent the project from going forward, and simultaneously to express agreement that the project was not "good for the area or consistent with current land use standards." CP at 436. Importantly, the commissioner said that his understanding was that the County had worked to find ways *within the law* to deny the project. While improper purpose is not synonymous with "illegal" purpose, it follows logically that a

32

County's pursuit of legally available avenues to address its concerns would necessarily not constitute "improper purposes." Unlike *Pleas*, the County here did not use improper means to single out the Woods View project, and WVII fails to show that the County had an improper purpose in communicating with DOH. We conclude that there is no genuine issue of material fact as to improper purpose.

In summation, to avoid summary judgment, WVII must show that a genuine dispute exists or that they have established all five elements of tortious interference. Here, WVII fails to establish a genuine issue of material fact as to the improper purpose or improper means element. Thus, summary judgment is properly granted as to WVII's intentional tortious interference claim. Consequently, we decline to examine the issues of damages or causation.[20]

## VII. TAKINGS

WVII makes three arguments to support its takings claim. It argues (1) that a permanent and substantial reduction in property value is sufficient to state a successful takings claim, (2) the County compelled DOH to require WVII to burden its property with a covenant prohibiting the transfer of individual lots in the development, and (3) the County engaged in "a set of guerilla [sic] tactics unreasonably intended to hold up and prevent construction of a project," thus effecting a

---

[20] The County argues that the tortious interference claim is collaterally estopped by the federal court's decision in this case. Because the tortious interference claim fails on its merits, we do not address the County's collateral estoppel argument.

taking.[21] Reply Br. of Appellant at 29. We affirm summary judgment as to takings because WVII cannot show that the County's actions resulted in a taking.

Washington State Constitution article I, section 16 states that "[n]o private property shall be taken or damaged for public or private use without just compensation having been first made." Under existing Washington and federal law, a police power measure can violate article I, section 16 of the Washington State Constitution or the Fifth Amendment of the United States Constitution and thus be subject to a takings challenge when (1) a regulation affects a total taking of all economically viable use of one's property, *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992); (2) the regulation has resulted in an actual physical invasion upon one's property, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 433, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982); (3) a regulation destroys one or more of the fundamental attributes of ownership (the right to possess, exclude other, and to dispose of property), *Presbytery of Seattle v. King County*, 114 Wn.2d 320, 330, 787 P.2d 907, *cert. denied*, 498 U.S. 911 (1990); or (4) the regulations were employed to enhance the value of publicly-held property, *Orion Corp. v. State*, 109 Wn.2d 621, 651, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S.

---

[21] In its opening brief, WVII argues only that the superior court should not have dismissed the takings claim because the County did not specifically request summary judgment on that claim. We reject WVII's argument that the County did not request summary judgment on the takings issue because it did so in a supplemental brief.

1022 (1988); *Manufactured Housing Cmtys. of Wash. v. State*, 142 Wn2d 347, 355-56, 13 P.3d 183 (2000).[22]

Under these controlling legal principles, WVII fails to show that a taking occurred.

## A. A PERMANENT AND SUBSTANTIAL REDUCTION IN PROPERTY VALUE

Relying on *Borden v. City of Olympia*, 113 Wn. App. 359, 374, 53 P.3d 1020 (2002), *review denied*, 149 Wn.2d 1021 (2003), WVII claims that a permanent and substantial reduction in property value is sufficient to state a takings claim. But in *Borden*, the court found that no taking had occurred based on a flooding incident, and WVII does not explain how *Borden* supports its position in any respect. WVII also relies on *Lambier v. City of Kennewick*, 56 Wn. App. 275, 279, 783 P.2d 596 (1989), *review denied*, 114 Wn.2d 1016 (1990).

In *Lambier*, due to the city's design and construction of a road, up to 12 vehicles ended up crashing in the Lambiers' yard over time, causing the resale value of their home to plummet to nearly half its value. 56 Wn. App at 277. The court noted that the city affirmatively undertook the construction project that resulted in the Lambiers' damages. *Lambier*, 56 Wn. App. at 280. WVII argues summarily that a taking is established so long as it can show a "subsequent decline in market value" resulting from the regulation. *Lambier*, 56 Wn. App. at 279 (citing *Martin v. Port of Seattle*, 64 Wn.2d 309, 320, 391 P.2d 540 (1964), *cert. denied*, 379 U.S. 989 (1965)). But we note that both *Borden* and *Lambier* are distinguishable because the plaintiffs there alleged a (1)

---

[22] Regulations have also been found unconstitutional because they violate substantive due process whether or not a total taking or physical invasion has actually occurred. *See Guimont v. Clarke*, 121 Wn.2d 586, 608, 854 P.2d 1 (1993), *cert. denied*, 510 U.S. 1176 (1994); *Margola Assocs. v. City of Seattle*, 121 Wn.2d 625, 649, 854 P.2d 23 (1993). WVII does not assert a substantive due process claim.

government's (2) physical invasion that (3) resulted in damages. And here, WVII does not allege a government's physical invasion onto WVII land that caused damages. Again WVII fails to explain how *Borden* or *Lambier* support its takings claim here.

Perhaps more to the point, neither *Lucas* nor *Guimont v. Clarke*, 121 Wn.2d 586, 854 P.2d 1 (1993), *cert. denied*, 510 U.S. 1176 (1994), upon which WVII relies, suggest that a reduction in property value alone constitutes some sort of per se taking. As just noted, *Lucas* held that a taking occurs when a regulation eliminates all economically viable use of one's property. 505 U.S. at 1019. Our Supreme Court incorporated this rule into its threshold test in determining whether a regulation has worked a taking. *Guimont*, 121 Wn.2d at 600. We recognize that this appeal does not challenge a regulation as did the appeals in *Lucas* and *Guimont*. Nonetheless, WVII's apparent position that any substantial loss of property value alone is a taking is at odds with the rationales underlying both these decisions. If the loss of some economically viable use is not per se a taking, then neither is the loss of some property value.

### B. FUNDAMENTAL ATTRIBUTE OF PROPERTY OWNERSHIP

Citing *Manufactured Housing*, WVII next argues that a property owner has the unrestricted right to dispose of it and anything that destroys that right without compensation constitutes a taking. WVII claims that the County compelled DOH to require WVII to burden its property with a covenant prohibiting the transfer of individual lots and these actions by the County constitute a taking. This argument fails.

The central flaw in WVII's position is that the County had no legal authority to compel the DOH to require anything of WVII. That authority rested with DOH alone. The County simply asserted a reasonable, legal position to DOH, and the DOH made its own decision in response. The County did not interfere with WVII's property ownership rights in any manner.

## C. TAKING BY DELAY

Finally, WVII argues that the County engaged in "a set of guerilla [sic] tactics unreasonably intended to hold up and prevent construction of a project," thus effecting a taking. Reply Br. of Appellant at 29. WVII cites to no authority, and we have found none, for the position that government delay can constitute a taking. "'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.'" *Nguyen v. City of Seattle*, 179 Wn. App. 155, 171, 317 P.3d 518 (2014) (internal quotation marks omitted) (quoting *State v. Logan*, 102 Wn. App. 907, 911 n.1, 10 P.3d 504 (2000)).

Accordingly, the County's actions do not constitute a taking as a matter of law. The superior court did not err in granting summary judgment on WVII's takings claim and we affirm.[23]

---

[23] Accordingly, we do not reach the issue of whether the takings claim was collaterally estopped by the federal court's decision.

## CONCLUSION

We reject the County's LUPA and statute of limitations arguments. Regarding the superior court's grant of summary judgment on the issues of standing, negligence, takings, and tortious interference, we affirm.[24]

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Johanson, C.J.
JOHANSON, C.J.

We concur:

BJORGEN, J.

MELNICK, J.

---

[24] The County argues that it cannot be held liable for its communications to DOH under the *Noerr-Pennington* doctrine. *E. R.R. Presidents Conf. v. Noerr Motor Freight*, 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961). That doctrine immunizes petitions to government from certain types of liability. Because we hold that WVII's claims against the County fail, we need not address the County's immunity under this doctrine.