IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| SAN JUAN COUNTY, a political subdivision and Charter County of the State of Washington, | ) ) ) ) | No. 80232-1-I |
| | ) | DIVISION ONE |
| Appellant, | ) ) | |
| v. | ) ) | |
| CHRISTOPHER T. BURN and CHRISTINE JOHNSON, a married couple; and TWO NORTHERN LIGHTS, LLC, a Washington State limited liability company, | ) ) ) ) ) ) | UNPUBLISHED OPINION |
| Respondents. | ) ) | |

BOWMAN, J. — San Juan County appeals an order granting summary judgment and quieting title in favor of the plaintiffs to a 600-foot strip of land just north of an established county road. Because both parties produced competing competent evidence, the trial court erred in resolving the dispute as a matter of law. We reverse and remand for further proceedings.

FACTS

Washington State incorporated Waldron Island, sparsely populated and mostly rural, into San Juan County in 1889. Early settlers mostly homesteaded on the north and south coasts since many were engaged in the fishing trade. The island retains much of its original character today, having few inhabitants

Citations and pin cites are based on the Westlaw online version of the cited material.

and almost no modern conveniences.[1]

In 1889 and 1890, the state enacted "road laws" setting forth procedures for establishing government roads.[2]  These statutes required county commissioners to consider road petitions, determine the utility of a proposed road, and approve funds for its survey, construction, and maintenance.[3]

In 1891, several Waldron Island landowners petitioned the San Juan County Board of County Commissioners (Board) to construct a road so that northern inhabitants could access the southern dock and post office and to afford "the settlers on the Island an easy access to the landings on both North [and] South [ends] of the Island."  The Board paid a surveyor to "view, survey, locate and establish a County Road."

According to the 1891 survey and report of viewers,[4] the road was to run from south to north, "[c]ommencing on the beach 40 rods[5] south of the section line" and traveling in a northwesterly direction.  The survey crew noted three mileposts to be placed along the way and the presence of a "fir [tree] 36 in[ches in] dia[meter]" near the northern terminus.

---

[1] Waldron Island has consistently maintained a population of "fewer than 100 full-time residents."  San Juan County Code (SJCC) 16.36.030.  The state designated it as a "Limited Development District" and "[c]ommercial recreation facilities are prohibited."  Chapter 16.36 SJCC; SJCC 16.36.030.  There is no ferry service, only one county-owned dock, and no electricity or county water supply.  SJCC 16.36.030, .060.

[2] See LAWS OF 1889-90, ch. XIX.

[3] The laws also required the commissioners to "cause monuments of stone to be placed at the beginning and terminus of all roads established under this act."  LAWS OF 1889-90, ch. XIX, § 34.

[4] Viewers were members of the community who observed and assisted the surveyors.

[5] A "rod" is a unit of length.

In August 1891, the Board approved construction of "Road No. 1," that it was "to be 50 feet wide," and "ordered [it] opened as per the survey." The Board's minutes from that meeting note:

> All of the above named and foregoing specified county roads are hereby declared to be open to the public and are declared to be legal county roads to be opened and maintained at the public cost: all being situate in the County of San Juan and State of Washington.

Today, the Cowlitz Bay-Waldron Center Road[6] runs across Waldron Island from the south to the north, with 2.49 miles open to vehicular traffic. The 600-foot area to the north of the current road (the disputed area) traverses plats owned by members of the Burn family since the 1930s.

In 1981, a member of the Burn family wrote a request to the San Juan County assessor (Assessor) to revise its maps by removing the disputed area from the designated road. The San Juan County Public Works Department survey party chief concurred with Burn that "there is no deed on record for county ownership of [the disputed] area," and the San Juan County Road Department survey crew chief agreed to remove the disputed area as a designated road from county maps. But the county later reversed its position. In response, on December 11, 2017, Christopher Burn, his wife Christine Johnson, and his sister's limited liability company Two Northern Lights LLC (collectively Burn) filed a complaint against San Juan County (County) seeking a declaratory judgment and order quieting title to the disputed area in their favor.

---

[6] First named Road No. 1, then "Road No. 140."

3

Both parties filed motions for summary judgment. Arguing that the County did not open the disputed area to the public as a road within five years of the 1891 road construction decree, Burn claimed the County vacated its right-of-way in 1896.[7] Burn submitted multiple declarations with supporting documentation. The County also submitted declarations and exhibits to argue that it opened the disputed area for public use as part of the original road decree.

In a letter ruling followed by an "Order on Cross Motions for Summary Judgment," the trial court found the County vacated the disputed area as a matter of law, denied the County's summary judgment motion, granted summary judgment for Burn, and quieted title to the disputed area in their favor.[8] The County appeals.

ANALYSIS

The County argues that the court erred in granting summary judgment for Burn because a fact finder must weigh the competing evidence presented by both parties to determine whether the County opened the disputed area to the public as a road before 1896. We agree.

We review a trial court's order granting a motion for summary judgment de novo. Frisino v. Seattle Sch. Dist. No. 1, 160 Wn. App. 765, 776, 249 P.3d 1044 (2011). We undertake the same inquiry as the trial court and consider the evidence and the reasonable inferences from it in the light most favorable to the

---

[7] There is no disagreement that if the County vacated the disputed area, Burn owns it.

[8] Burn raised a separate claim in their summary judgment motion that even if the County did not lose its property interest by nonuse, its rights extinguished because the disputed area went unrecorded with the County auditor. Because the trial court found the nonuser statute dispositive, it did not rule on this claim.

nonmoving party.  <u>Wilson v. Steinbach</u>, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982); <u>Schaaf v. Highfield</u>, 127 Wn.2d 17, 21, 896 P.2d 665 (1995).  Summary judgment is appropriate only

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

CR 56(c); <u>White v. State</u>, 131 Wn.2d 1, 9, 929 P.2d 396 (1997).

By cross moving for summary judgment, the parties concede there were no material issues of fact.  <u>Pleasant v. Regence BlueShield</u>, 181 Wn. App. 252, 261, 325 P.3d 237 (2014) (citing <u>Tiger Oil Corp. v. Dep't of Licensing</u>, 88 Wn. App. 925, 930, 946 P.2d 1235 (1997)).[9]  But "[e]ven where the evidentiary facts are undisputed, if reasonable minds could draw different conclusions from those facts, then summary judgment is not proper."  <u>Chelan County Deputy Sheriffs' Ass'n v. Chelan County</u>, 109 Wn.2d 282, 295, 745 P.2d 1 (1987) (citing <u>Money Savers Pharmacy, Inc. v. Koffler Stores (W.) Ltd.</u>, 37 Wn. App. 602, 608, 682 P.2d 960 (1984)).

The parties dispute whether the County vacated its road interest under the state's "nonuser" statute.  <u>See</u> RCW 36.87.090.  The nonuser statute in effect during 1891 provided:

> Any county road, or part thereof, which has heretofore been or may hereafter be authorized, which remains unopened for public use for the space of five years after the order is made or authority granted

---

[9] Although the County states in its brief that "[d]isputes of material fact invalidate" paragraphs 6, 7, and 8 of the court's Order on Cross Motions for Summary Judgment, it appears to argue that the court's legal conclusions in those paragraphs are not supported by the undisputed facts.

for opening the same, shall be and the same is hereby vacated,
and the authority for building the same barred by lapse of time.

LAWS OF 1889-90, ch. XIX, § 32.[10]  By enacting the five-year nonuser statute, the legislature "fixed a statutory time limit within which the county was required to perform the condition of the grant," or else " 'a reversion of the authority to construct a road would result.' "  Wells v. Miller, 42 Wn. App. 94, 97, 708 P.2d 1223 (1985) (quoting Miller v. King County, 59 Wn.2d 601, 605, 369 P.2d 304 (1962)).  "The burden of showing that such a [road] has remained unopened for public use for the period named in the statute [is] upon those who rest their claims upon such a fact."  Brokaw v. Town of Stanwood, 79 Wash. 322, 325-26, 140 P. 358 (1914).

The parties disagree about what it means to "open" a public road.  Burn contends that "some measurable level of actual improvement is required for a road to be considered 'opened' under the nonuser statute."  The County claims that physical work is unnecessary and that a "formal announcement" declaring the road open to public use suffices.  Several cases offer guidance.

In Cheney v. King County, 72 Wash. 490, 491, 130 P. 893 (1913), landowners along Lake Washington platted an area in 1890, including a 12-foot-wide diagonal street running parallel to the shoreline.  When the landowners

_____

[10] The nonuser statute has remained relatively unchanged.  Currently, RCW 36.87.090 provides:

Any county road, or part thereof, which remains unopen for public use for a period of five years after the order is made or authority granted for opening it, shall be thereby vacated, and the authority for building it barred by lapse of time: PROVIDED, That this section shall not apply to any highway, road, street, alley, or other public place dedicated as such in any plat, whether the land included in such plat is within or without the limits of an incorporated city or town, or to any land conveyed by deed to the state or to any county, city or town for highways, roads, streets, alleys, or other public places.

platted the area, old footpaths ran through the tract. Cheney, 72 Wash. at 492. About 15 years later, the landowner sold the plat to a new owner, who improved it by building a home. Cheney, 72 Wash. at 491. Five or six years after building the home, King County claimed ownership over the platted street. Cheney, 72 Wash. at 491. The landowners showed that the county road supervisor never formally opened the street and that the public did not travel on the street in a manner consistent with a public roadway. Cheney, 72 Wash. at 492. The court concluded that intermittent use of the old pathways did not establish that the county opened the street to the public. Cheney, 72 Wash. at 492-93.

Smith v. King County, 80 Wash. 273, 274, 141 P. 695 (1914), involved a portion of land abutting Lake Washington that was platted in 1905 in the Bryn Mawr neighborhood of unincorporated King County. Although platted as a street, the area remained littered with brush, stumps, and logs 22 years later. Smith, 80 Wash. at 275-76. Witnesses also testified that people considered portions of the land a park and used the land for camping or as "winding footpaths." Smith, 80 Wash. at 276. Citing Cheney, the court held that this type of "use" did not amount to opening a public road. Smith, 80 Wash. at 276.

More recently, in Real Progress Inc. v. City of Seattle, 91 Wn. App. 833, 836, 963 P.2d 890 (1998), we rejected the city of Seattle's ownership claim to a street dedicated in 1884, in part by applying the nonuser statute. There, a 1936 aerial photograph showed no evidence of street development; a 1920 map noted the area was "impassable"; and an expert testified that the area showed " 'no evidence of public improvement,' " such as utilities, and that the street area was

" 'impassable to vehicular traffic.' " Real Progress, 91 Wn. App. at 844-45. With affirmative evidence showing "impassable" physical characteristics, we concluded the trial court reasonably found the city "never opened" the street. Real Progress, 91 Wn. App. at 844-45.

On the other hand, we have rejected attempts to apply the nonuser statute rigidly simply because the "roadway" may be primitive. Instead, we have recognized that topography and historical context matter. For instance, in Vetter v. K. & K. Timber Co., 124 Wash. 151, 154-55, 213 P. 927 (1923), the court concluded that even obstructed or primitive areas may be considered open roads. There, the road began as "a mere wagon track winding between stumps and through obstructing brush," but it was "upgraded" and improved over time, and the evidence showed the road was "used continuously since the plat was filed." Vetter, 124 Wash. at 152-53. And in Albee v. Town of Yarrow Point, 74 Wn.2d 453, 458, 445 P.2d 340 (1968) (quoting 10 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 30.11, at 644 (3d ed. rev. 1966)),[11] our Supreme Court held, "[T]he fact that the current use of the street end is limited to foot traffic is of no particular significance[,] for 'a street used only by pedestrians is nevertheless a public . . . street within the legal meaning of that term.' "

These cases support Burn's argument that "the mere announcement that a road has been ordered to be 'opened' does not mean the road is actually 'open for public use.' " The County claims these cases are distinguishable because

---

[11] Albee is not a nonuser statute case. But the court considered the characteristics and historical use of the disputed area—shoreline giving access to the lake, which the city claimed as a public "street" easement—in determining that the city could make "certain improvements in and uses of" the land. See Albee, 74 Wn.2d at 454-57.

they involve "platted streets in private residential developments." Quoting Smith, 80 Wash. at 276, the County argues this is a "critical distinction" because " 'a statutory dedication of streets to a public use is merely a tender of a servitude or easement to the public which the public is at liberty to accept or reject.' " The County asserts, "In contrast, a petition to open a road starts a complicated statutory process that requires the County to accept responsibility for the road and formally open it." Thus, the County contends that when, as here, it made a formal announcement in 1891 declaring the road open to public use, the announcement is enough when it follows a road petition.

But in Wheeler v. Rendsland, 38 Wn.2d 685, 686, 231 P.2d 322 (1951), our Supreme Court applied the nonuser statute to a road established by petition and an "Order of Establishment" issued by county commissioners. The county "did some work" on the west end of the road, including blasting for ditches, and the evidence showed some landowners, fisherman, and hunters used the road sporadically. Wheeler, 38 Wn.2d at 686. But the county completed no work on the rest of the road, the road was "impassable" during high tide, and the evidence showed "the road never was used generally by the public." Wheeler, 38 Wn.2d at 686-87. Despite the formal Order of Establishment following the road petition, the court affirmed the trial court's finding that the county never opened the

disputed area of the road for public use.  Wheeler, 38 Wn.2d at 689.[12]

Here, we agree with the trial court that to open a road for public use as contemplated under the nonuser statute, "it is not enough for a road to be established by the governmental authority.  Rather, it must be physically opened in some manner."  But we disagree that the lack of evidence of improvement by "clearing and grading," "graveling," and "ditching" is dispositive in this case.

Burn argues that viewing the evidence in a light most favorable to the County, they have met their burden to show that the County did not open the disputed area as a public road before 1896.  But the record shows that the parties offered competing competent evidence on this question.

First, the County offered the 1891 road petition itself, which sought "a County road to be opened" "north on 1/16 Sec[tion] line to the beach on the north side."  Several later documents show the County designed, constructed, and opened the road to accomplish this purpose.  We consider them chronologically.

In 1894, the United States Geological Survey surveyed Waldron Island and produced a "U.S. Coast and Geodetic Survey" report and map (T-Sheet), arguably showing the road extending from the south end of the island all the way to the beach on the north end, including through the disputed area.  And in 1898,

---

[12] Wheeler involved an action for damages because of an obstructed roadway, requiring the court to determine whether it was a public road.  Wheeler, 38 Wn.2d at 686.  Because the court issued judgment following trial (rather than summary judgment), the appellate court considered only whether the trial court's finding that the road was not opened to the public was supported by substantial evidence.  Wheeler, 38 Wn.2d at 689.  Recognizing that a rational trier of fact could have reached an opposite conclusion, our Supreme Court noted that " '[t]he evidence does not so preponderate one way or the other as to warrant our interference.' " Wheeler, 38 Wn.2d at 689-90 (quoting Mohr v. Pierce County, 65 Wash. 370, 373, 119 P. 747 (1911)).

the Washington State Board of Land Commissioners[13] approved the County's purchase of tidelands abutting the disputed area for "right of way for public road purposes."

An undated[14] "San Juan County Road Map Book," quoting the 1891 survey and report of viewers, described the road as 205.5 chains[15] long and following the section lines "[n]orth to [the] beach."  And a 1933 "Metsker Map"[16] showed the road running all the way to the beach.  Similarly, a 1949 subdivision map of the Burn properties showed a "county road" out to the beach, with a "fence" noted along part of its eastern boundary.  Finally, a 1973 to 1996 Assessor's map showed a "county road" extending over the disputed area to the beach.

The County also offered the declaration of its engineer, Colin Huntemer, who visited the disputed area in 2018.  He described the disputed area as a "footpath," with some evidence of clearing, such as "deliberate[ly]" stacked piles of rock and cordwood.  Huntemer also observed a "borrow pit"[17] of loose sand and gravel where the disputed area meets the beach, just above the tidelands.

---

[13] Now the Washington State Department of Natural Resources Commissioner of Public Lands.

[14] This map book was prepared sometime after 1911 because it includes "[f]ield notes" for Road No. 2, petitioned for in 1895, and Road No. 3, petitioned for in 1911.

[15] A "chain" is a measuring unit used in surveying that consists of 100.0 links joined by rings.  A chain is 66.0 feet long and each link is 7.9 inches.  There are 80.0 chains in one mile. Here, 205.5 chains equal 2.6 miles.

[16] Charles Metsker started mapping the Pacific Northwest in 1901.  See METSKER MAPS, http://www.metskers.com/c1439/About-Us.html (last visited Feb. 12, 2021).

[17] Huntemer stated that a "borrow pit" is commonly used as a source for construction materials.

Burn offered opposing maps, including a San Juan County Public Works Department "Road Book Index" map and a map of County-owned access points to the water that do not show a road in the disputed area.[18] Burn pointed out that the 1933 Metsker Map, which appears to show a road through the disputed area, noted that "all county roads [are] graveled." The disputed area is not currently graveled. Neither party produced records of County-funded work or maintenance in the disputed area.

Burn also provided copies of deeds and other conveyances involving "Lot 5" and "Lot 6," the properties on which the disputed area exists. No County-owned right-of-way appears in the chain of title for either lot. For example, in 1892, after the Board ordered the road opened, a homesteader acquired Lot 5 by federal patent. The original deed did not reference any road encumbrances. Another settler obtained Lot 6 by federal patent in 1897, again without mention of a County right-of-way. Owners conveyed both plats multiple times and they eventually became the property of the Burn family. None of the conveyances included a County right-of-way or mentioned a road.[19]

The owners of Lot 6 did, however, grant easements in 1961 across their property outside the disputed area for "ingress and egress" and "the construction, maintenance, and repair of a road." And in 1895, Waldron Island residents

---

[18] Burn also submitted a 1932 Canadian aerial photograph of the area, a 1953 University of Washington topographic map, and a 1954 map by the United States Coast and Geodetic Survey (now known as the National Oceanic Service division of the National Oceanic and Atmospheric Administration).

[19] But Burn did not show that any of the other deeds or conveyances for other lots over which the rest of the undisputed area of the road extends included a County right-of-way or mentioned a road.

petitioned for another county road "to the beach on the N.W. side" of Lot 5. A third petition in 1911 sought road access through property next to Lot 5 "to [the] high water mark on the beach" because "there is no other road which is of equal utility for the citizens residing in the vicinity of said proposed road." Burn's surveyor asserted these actions would not have been necessary if the County had "formally opened" a public right-of-way in the disputed area.[20]

Burn also tried to show that the claimed road would have been different from other contemporaneous road grants. First, the Board ordered in 1891 that Road No. 1 be 50 feet wide, while most other roads were 33 feet wide. Second, according to the 1894 federal T-Sheet, any pathway that might have existed over the final 250 feet of the disputed area veered "significantly" away from the center section line to the east, which differs from other County roads that "usually" follow section lines.

As for its physical characteristics, the disputed area currently resembles a footpath with dense underbrush and mature trees throughout. Neither County engineer Huntemer nor Burn's surveyor noted any milepost markings as set by the original survey crew or "monuments of stone"[21] along the route. Likewise, there are no public utilities or grading in the disputed area. The path terminates at a steep slope down to a natural spring, beyond which lies the beach. And

---

[20] Burn also emphasized that the original owners of Lot 5 and Lot 6 did not sign the 1891 road petition, suggesting they had no need of a public right-of-way to the north beach, while the owner of Lot 5 did endorse the second 1895 road petition. The evidence shows, however, that the original settlers did not acquire Lot 5 until 1892 and Lot 6 until 1897, after residents made the 1891 road petition.

[21] LAWS OF 1889-90, ch. XIX, § 34.

trees hundreds of years old and of substantial size rest in what would have been the middle of the roadway.[22]

Burn also commissioned geotechnical engineer and surveyor Ed Kilduff to collect LIDAR[23] data and conduct other subterranean tests, which revealed no signs of "imported granular [road] base material." Kilduff compared soil from both within and outside of the disputed area, and the samples from within the disputed area showed "a natural soil profile . . . with no evidence of disturbance or road-like compaction." But soil samples taken from areas where the undisputed County road currently exists "were compact and indicative of a road base." Kilduff also used ground-penetrating radar and a "Dynamic Cone Penetrometer" to conclude the County never constructed a road in the disputed area because

> [n]one of my research revealed any indication that there has ever been anything more than occasional foot traffic within the brush. There was no evidence to suggest a pattern or regular use by large animals, or that buggies or any other equipment utilized the disputed area in the late 1800's.

Finally, Burn pointed to the 1981 statement from the San Juan County Public Works Department affirmatively asserting that their surveyor "has researched R[oa]d [No.] 140 and determined there is no deed on record for County ownership of the area," and agreeing to "remov[e] the portion of road not built and maintained by the County."

---

[22] As stated, the original 1891 surveyor observed at least one fir tree of 36 inches in diameter at the northern end of the proposed road. In 2017, Burn's certified arborist evaluated several trees of various sizes "reasonably close to the centerline of the corridor that is the subject of the disputed area." He determined at least one tree was between 250 and 325 years old and several more were probably more than 100 years old, suggesting the trees would have existed during the 1891 to 1896 time frame.

[23] Light detection and ranging. The County asserted the "LIDAR data is . . . not helpful because it merely shows the present condition of the surface and not conditions over 125 years ago."

The trial court weighed all the evidence and determined that "the plaintiffs have borne their burden of proving that the disputed area was never opened." But summary judgment is improper if resolution "requires the weighing of 'competing, apparently competent evidence.' " Woods View II, LLC v. Kitsap County, 188 Wn. App. 1, 19, 352 P.3d 807 (2015) (quoting Larson v. Nelson, 118 Wn. App. 797, 810, 77 P.3d 671 (2003)).

Here, some maps appear to depict a designated roadway through the disputed area, while others do not. The markings on the 1894 T-Sheet could reflect a road designation in the disputed area, but the definitions of those markings are speculative because the 1894 map does not have a legend. Likewise, a surveyor may have created the T-Sheet based on personal observations or could have simply copied it from the County's 1891 road survey. The County's purchase of tidelands in 1898 next to the disputed area "for right of way for public road purposes" also raises competing inferences. The County claims this easement shows public access through the disputed area to the beach, while Burn argues "public road purposes" could include using the tidelands as an excavation site for road building materials. The trial court itself acknowledged more than one reasonable interpretation from this evidence.

A fact finder could draw competing inferences from the land's current condition as well. Burn showed that the disputed area differs greatly from the other 2.49 miles of established roadway, which both sides agree the County has improved and maintained since 1891. It is true that instead of a demarcated and graded gravel roadway, the disputed area remains a dirt path through heavy

15

underbrush, studded with large trees, and shows little evidence of human activity. But the County posits that residents traveling on foot or by horseback could have routinely used the disputed area between 1891 and 1896 without leaving demonstrable evidence of clearing. As in Vetter, such travelers could have skirted the trees known to exist on the path in 1891. See Vetter, 124 Wash. at 154-55.

The County agrees that there has been no vehicular travel in the disputed area and that the pathway is neither well traveled nor upgraded, but it also argues that "[t]o this day the disputed area has not been used in a way that is inconsistent with its historical use as a right of way." For the same reason, a fact finder could reasonably interpret Burn's 2017 soil samples and compaction data in contrary ways. One could conclude that the lack of discernable compaction shows the area was not improved. But it is also reasonable to infer that foot and horseback travel, the primary means of transport on Waldron Island in the 1890s, would not leave measurable displacement 120 years later.

While the County must have affirmatively acted in some manner to open the road,[24] the road's condition today may not reflect those physical efforts, particularly where the County established a road for travel by a tiny population[25] over rugged terrain in the 1890s. In that context, demonstrative clearing or improvement of the disputed area may not have been necessary for public use.

---

[24] For example, by expending funds for, marking, making physical improvements to, maintaining, or enclosing the right-of-way. See, e.g., Vetter, 124 Wash. at 152-53.

[25] The record lacks census data showing population growth on Waldron Island between 1891 and 1896. But SJCC 16.36.030 states that the 1990 census counted 70 Waldron Island residents, and that there have been fewer than 100 full-time residents since the 1920s, "with a substantial increase in the summer" of part-time residents.

Burn offers compelling evidence in support of their argument that the County did not open the disputed area as a public road. But considering all the evidence in the light most favorable to the County, we conclude that a reasonable trier of fact could find that the County opened the road for public use by the small population of Waldron Island at some time between 1891 and 1896. As a result, summary judgment is not appropriate.[26]

We reverse the order granting summary judgment and quieting title in favor of Burn and remand for further proceedings.[27]

_____
Brennan, J

WE CONCUR:

_____          _____
Coburn, J.                                      Verellen, J

---

[26] Because resolution of whether the County opened a public road requires the weighing of competing evidence, we also reject the County's contention that it is entitled to summary judgment. See Woods View II, 188 Wn. App. at 19.

[27] Burn argues in the alternative that they are entitled to summary judgment because the County failed "to record its interest in a public right of way with the County Auditor [so it] did not provide subsequent purchasers with constructive notice of its claimed interest," thereby extinguishing the County's interest in the disputed area. See Ellingsen v. Franklin County, 117 Wn.2d 24, 25, 810 P.2d 910 (1991). But the County offered evidence that the Board recorded the 1891 road petition, report of viewers, and survey report with the County auditor. Whether the County recorded these documents and whether the documents provided sufficient notice of the County's interest in the disputed area are material issues of fact that must be resolved by a trier of fact. See Hudesman v. Foley, 73 Wn.2d 880, 889-90, 441 P.2d 532 (1968) (questions of whether the purchaser was put on inquiry, and whether inquiry would have resulted in notice, are ordinarily for the jury).